*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————— :
                                              :
KATRINA DOWLING o/b/o D. Y.,      :
                                              :
                          Plaintiff,      :          Civil Action No. 17-2079
                                              :
           v.                                 :
                                              :          **OPINION**
                                              :
NANCY A. BERRYHILL,             :
Acting Commissioner of Social Security,  :
                                              :
                          Defendant.     :
———————————————————— :

**WOLFSON, United States District Judge:**

This action, filed under 42 U.S.C. § 405(g) on behalf of D.Y., by his mother, Katrina

Dowling ("Plaintiff"), proceeding *pro se*, seeks judicial review of the an administrative law

judge's ("ALJ") final decision that Plaintiff is no longer entitled to previously granted

Supplemental Security Income ("SSI") childhood disability benefits under Title XVI of the

Social Security Act, 42 U.S.C. § 1381, *et seq*.

For the reasons the follow, Plaintiff's appeal is denied.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This appeal concerns the determination that D.Y., a child, was no longer eligible for SSI

benefits, which he had been receiving since shortly after birth. D.Y. was born prematurely at 32

weeks on May 16, 2011, Administrative Record (hereinafter "AR") at 58, and, at birth, weighed

1605 grams (3.5 pounds), with a head circumference of 28 centimeters and a birth length of 42

centimeters. AR 17. In June 2011, when D.Y. was one month old, Plaintiff, his mother, applied

for, and received, child's SSI on behalf of D.Y. due to his low birth weight and gestational age at birth. AR 17, 70.

On June 17, 2013, after D.Y. had been receiving benefits for two years, a continuing disability review determined that D.Y. was no longer disabled because his condition improved, he was developing normally, and he no longer functionally equaled the criteria for the social security listing for low birth weight. AR. 88. The decision also noted that D.Y. had not developed any new conditions that functionally equaled the criteria for any listings, as D.Y.'s asthma responded to medication and did not interfere with his daily functioning. AR 88-89. This decision was upheld upon reconsideration. AR 117-125.

D.Y.'s mother requested a hearing before an ALJ, which was held on April 19, 2015. AR 32-52. D.Y.'s mother appeared and testified at the hearing. AR 32-52. On June 8, 2015, the ALJ issued a decision finding that D.Y. had medically improved and was no longer disabled as of June 17, 2013. AR 10-31. On January 25, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Acting Commissioner. AR 1-6. Plaintiff then filed this civil action seeking judicial review of the ALJ's decision.

**A. Social Security Disability Decisions**

On June 21, 2011, Plaintiff applied for SSI benefits based on his premature birth and low birth weight. AR 17, 70. On July 25, 2011 the Social Security Administration ("SSA") approved Plaintiff's application and set his monthly payments at $705.25. AR 70. The decision approving the award noted that D.Y.'s "SSI payments may change if his situation changes," including if his medical condition improves. AR 73. As such, the decision informed Plaintiff that a "continuing disability review" would be conducted "at least once every three years if his medical condition is likely to improve" or "even if his medical condition is not likely to improve." AR 74.

On June 27, 2013, the SSA issued a Notice of Disability Cessation concerning D.Y. AR 88. The decision stated that, after a continuing disability review, it had been determined that D.Y. no longer qualified for SSI. AR 88. The decision stated that "[y]our child may experience infrequent asthma attacks. However, the attacks respond to prescribed medication and are not considered to interfere with daily functioning." AR 88-89. The decision also noted that "[o]ther problems [D.Y.] might have were evaluated but found to also not interfere with his function." AR 88.

On February 27, 2014, a disability hearing was held to reconsider the decision to cease D.Y.'s benefits. Present at the hearing were D.Y., Beatrice Dowling (D.Y.'s grandmother), and hearing officer Fahad J. Butt. AR 117. The hearing officer noted that Beatrice Dowling "testified the claimant continues to be disabled from asthma," "wakes up from breathing hard" and "says he appears to be developmentally delayed because he still wears diapers." AR 120.

Nonetheless, the hearing officer upheld the decision to cease D.Y.'s SSI, because, "[b]ased upon a review of the grandmother's testimony and the medical evidence in file…the claimant's condition has improved significantly." AR 120. He noted that while "D.Y. was previously allowed for prematurity… [h]e is currently developing normally," and that "[h]e has asthma, but it is not severe." AR 121. He concluded that D.Y.'s "impairment causes no more than minimal restrictions in his ability to perform age-appropriate activities. As a result, his condition is considered not severe." AR 120.

**B. Medical Evidence**

1. Hospital Records

According to hospital records from Capital Health in Trenton, New Jersey, D.Y. was born on May 16, 2011 at 32 weeks. AR 295. At birth he weighed 1,605 grams, had a head circumference of 28 centimeters, and was 42 centimeters long. AR 296. D.Y. remained in the

hospital for one month until June 13, 2011, and was discharged weighing 2320 grams, with a head circumference of 31.8 centimeters and was 46.5 centimeters long. AR 296. His active diagnoses at time of discharge included, "At risk for intraventricular Hemorrhage," "prematurity" and "psychosocial intervention," and his resolved diagnoses were "anemia of prematurity," "hyperbilirubinemia," "nutritional Support," "Respiratory Distress – newborn," "R/0 Sepsis-newborn." AR 296. The hospital reported that, despite his premature birth, DY.'s head circumference and length were "growing well." AR 299. His blood tests were generally normal, as were tests on ears, and a pneumogram analysis revealed no evidence of apnea or bradycardia. AR 332. A brain ultrasound revealed a prior "right germinal matrix hemorrhage," which "now has a cystic appearance compatible wit [sic] partial resolution." AR 336–37.

On April 24, 2012, Plaintiff brought D.Y. to the Capital Health Regional Medical Center in Trenton because DY was complaining of and "intermittently painful rash" located on his lower abdomen and inner thighs. AR 362. On examination, D.Y. was calm and quiet; friendly and smiling; had intact motor and sensation; and responded appropriately for his age. AR at 362-63. He was diagnosed with an abscess, and the doctor concluded, "In my judgment; in view of the above findings, this patient does not have a condition that requires surgical intervention or further testing in the emergency department at this time." AR 363. The treatment prescribed was Clindaymcin and warm compresses. AR 364.

On February 24, 2013, Plaintiff checked D.Y. into the hospital, because, according to Plaintiff, D.Y. had stuck a lollipop in his ear, causing it to bleed. AR 419. The injury was resolved with treatment. AR 417.

2. Dr. Lopez

On September 8, 2011, Lisa Lopez, M.D., D.Y.'s pediatrician, reported that D.Y. weighed 12 pounds and was 23.25 inches long. AR 378. A physical examination was normal

and reported "no concerns." AR 378. Dr. Lopez noted that D.Y.'s growth and development were normal, and he turned toward voices, laughed, and reached for objects. AR 378.

D.Y. returned to Dr. Lopez in June 2012 for an annual examination. AR 376. At that time, D.Y. weighed 9.13 kilograms (20.12 pounds), was 29.5 inches, and had a head circumference of 45 centimeters. AR 376. Dr. Lopez reported that D.Y. had "no significant past medical history." AR 376. Regarding D.Y.'s asthma, Dr. Lopez reported that he last used albuterol "1 week ago for a cough." AR 376. A physical examination was normal, and Dr. Lopez indicated that D.Y.'s growth and development were normal; he drank from a cup; walked holding onto furniture; and stood well alone. AR 377.

A follow-up examination on September 24, 2012 was, once again, normal. AR 372. D.Y. was 31 inches tall and weighed 22.14 pounds. AR 371. Regarding his asthma, Dr. Lopez again reported that he last used albuterol "1 week ago for cough," AR 370, and stated that he was prescribed "albuterol sulfate 2.5 mg /3 ml (0.083 %) Solution for Nebulization. 3 ml by Inhalation route every 4-6 hour." AR 372. The report also noted "no poor growth and development without a neurological deficit.," AR 371, and revealed that D.Y. had normal muscle tone, a normal gait and stance, and normal growth and development. AR 372. Dr. Lopez also indicated that D.Y. had a vocabulary of three to six words; understood and followed simple commands; walked well; stooped; and climbed stairs. AR 372.

D.Y. returned to Dr. Lopez in February 2013, when he was nearly two years old. AR 368. He weighed 25.57 pounds and was 33.46 inches tall. AR 368. An examination report noted that, again, D.Y.'s growth and development were normal and that he walked up steps and ran well. AR 369. At the examination, D.Y.'s Albuterol prescription was renewed by Dr. Lopez. AR 369.

During an examination two months later, when he was 23 months old, D.Y. weighed 11.81 kilograms. AR 366.

The results of an examination in November 2013 were normal. AR 399-400. D.Y. weighed 29 pounds and was 36 inches tall. AR 399. Dr. Lopez indicated that D.Y.'s growth and development were normal; he used two-to-three-word sentences; pointed to body parts on request; ran well; had normal muscle tone; and a normal gait and stance. AR 399. Dr. Lopez noted that D.Y. had "mild persistent asthma" and renewed his prescription for a nebulizer as needed. AR 400.

Dr. Lopez completed a child health record in November 2014, and indicated that D.Y. weighed 36 pounds, was 38 inches tall, and had no limitations to his physical activity, required no special equipment, had no allergies, required no special diet, and had no behavioral issues or mental health diagnoses. AR 440.

### 3. Agency Medical Experts

In June 2013, Katherine Azaro M.D., a state agency pediatrician, reviewed the medical evidence and completed a Childhood Disability Evaluation Form. AR 383-88. Dr. Azaro concluded that the evidence showed that D.Y. had undergone "significant medical improvement" and that D.Y.'s current impairments were not severe. AR 388. Dr. Azaro also opined that D.Y. had no limitations in any of the functional domains. AR 385-86. Dr. Azaro also explained that D.Y. was born prematurely but that his current weight varied between the 10th and 25th percentile for his age; his asthma had not required any inpatient stays, emergency room visits, oral steroids or sick visits for more than 12 months; and his pediatrician reported that his development was normal for his age. AR 388. On July 19, 2013, Samuel Kaye, another state agency pediatrician, reviewed the medical evidence and affirmed Dr. Azaro's decision as written. AR 389-94.

### C. Social Security Reports

In a February 5, 2013 function report, completed in connection with the continuing disability review, Plaintiff reported that D.Y., who was approximately 21 months old at the time, had no problem seeing or hearing. AR 208. She checked the box indicating he spoke understandably most of the time, but, confusingly, added a note that "he does not speak clearly or any words well." AR 209. Plaintiff did indicate that DY had difficulty understanding and learning, checking boxes indicating that he did not play pat-a-cake; did not use one or more words to ask for toys, food, or people; did not use his own name or "I" or "me" to refer to himself; did not listen to at least 5 minutes of stories being read; and did not follow two step directions, such as find your shoe and bring it to me. AR 210. Nonetheless, Plaintiff indicated that D.Y., waives "bye-bye," follows simple, one step directions such as, "come here" or "give it to me," knows and can point to parts of his face or body such as eye or hand when asked, and plays "pretend" with dolls or stuffed animals. AR 210.

In the same report, Plaintiff also indicated that DY had the following physical limitations: he could not walk up and down steps by himself, and could not stack small blocks high. AR 211. Nonetheless, according to Plaintiff, D.Y. was not limited in the following physical areas: crawling; standing with and without help; walking without holding on; climbing onto furniture; throwing a ball; dancing and jumping up and down; running without falling; pushing and pulling small toys; scribbling with a crayon or pencil; or holding a crayon or pencil with his thumb and fingers. AR 211.

Plaintiff also indicated that D.Y.'s impairment affected his behavior with other people in that "he does not say no at all," and he cries when he is upset sometimes. AR 212. Nonetheless, he was affectionate towards his parents and played "catch" or other simple games with other children. AR 212. Plaintiff also reported that D.Y. had a limited ability to take care his personal

needs, in that he could not undress himself. AR 212. Still, Plaintiff could drink from a glass without help; fed himself with a spoon; and cooperated in getting dressed and brushing his teeth. AR 212.

Just seven days later, on February 12, 2013, Plaintiff completed a second function report. She, again, indicated that D.Y. had no problems seeing or hearing, but had problems talking and did not have a vocabulary of at least 50 words, and his speech was rarely understood by others. She noted that D.Y. was trying "to learn to talk but mostly says du du du and he points his finger." AR 224. However, she reported that D.Y. could say simple words like "he," "bottle," or "doggy"; use two-word phrases like "mommy go" or "push toy"; and use short sentences of four words like "can I go out." AR 224. Plaintiff also reported that D.Y. had no difficulty understanding or learning and did not have limitations to his physical abilities. AR 225, 227. As to D.Y.'s asthma, Plaintiff reported that it was "very bad," but that "overall his health is great." AR 228.

On May 17, 2013, during a follow up disability report to the SSA, Plaintiff reported that D.Y. used a nebulizer for asthma attacks, which worked well, that D.Y. had not been to the emergency room, hospital, or any doctor for asthma attacks, and that D.Y. had no speech problem that she could discern. AR 232. During a June 14, 2013 report to the SSA, Plaintiff also reported that D.Y. had no problem stacking blocks and that his words were half-finished or partial. AR 234.

In a disability report completed in July 2014, D.Y.'s mother reported that D.Y.'s asthma was worse and D.Y. coughed all the time, did not go outside in the summer or fall, and was on medication. AR 245. Moreover, contrary to her earlier statements to the agency, D.Y.'s mother

reported that D.Y. had a speech impairment since May 2013. AR 245. She also stated that he visited the emergency room in December, 2012, due to DY's difficulty breathing.[1] AR 247.

On July 31, 2014, Plaintiff completed a "Disability Report" form in preparation for filing her appeal of the denial of benefits decision, and stated that since approximately July, 2013, D.Y.'s asthma had gotten worse, and "[h]e coughs…all the time, he does not go outside in the summer and fall," and was on medication. AR 245. She reported that he visited the emergency room on February 12, 2012, because he had problems breathing, and received an exam and breathing test. AR 247. She reported that his condition did not affect his ability to care for his personal needs, but stated that he no longer plays outside and that his activities are limited. AR 248. Around the same time, in July 2014, Plaintiff submitted remarks to the SSA, complaining that a representative from the agency had mandated that D.Y.'s reconsideration hearing take place even though Plaintiff was recovering from a serious illness and would have to send her mother in her place, who was unprepared to answer questions. AR 251. She also maintained that the hearing officer, Mr. Butt, did not base his decision on medical evidence. AR 252.

### D. School Report

A form documenting a family school conference on February 16, 2015, at which Plaintiff, D.Y., and teachers Erica L. Punko and Ivanna Tovar were present, describes some of D.Y.'s social and cognitive development. AR 438. It notes that D.Y. is "beginning to manage classroom rules, routines, and transitions with occasional reminders," and expands on this by observing that, "[a]fter cleaning up from breakfast, [D.Y.] moved one picture to the Block Area on the Planning Board and took the other picture to the Block Area before beginning to work there,"

---

[1] This emergency room visit is not corroborated by the record. Indeed, a medical overview of D.Y.'s medical history does not reveal any medical contact in December of 2012, or, as Plaintiff later stated, in February 2012. AR 395.

though "[h]e needed a reminder to move his picture from Home to School on the H/S Chart." AR 438. D.Y. was also "beginning to sustain balance during simple movement experiences," which was evidenced by his "[j]ump[ing] on bubble wrap, popping the bubbles, during Gross Motor Time." AR 438. The report indicates that D.Y. "is beginning to use complete four-to-six-word sentences" and was able to answer questions and identify concepts in a children's story. AR 438. D.Y. also demonstrated an ability to "practice[ ] an activity many times until successful," as, during a game of letter bingo, "he was persistent with finding the letters that corresponded to the cards when he first misidentified them" and "called out 'I got it' when he correctly matched the letters." AR 438.

Regarding his strengths in learning, literacy and math, the report indicates that D.Y. "practiced identifying the letters in his name," "repeated the letters in his first name," "identified circle and triangle, counted to 8, [and] drew a picture and identified it as a boy." AR 438.

**E. Plaintiff's Testimony Before ALJ**

On April 9, 2015, Plaintiff testified at a hearing held before Daniel N. Shellhamer, ALJ, Office of Disability Adjudication and Review, Social Security Administration. Plaintiff testified that that she brought the case

> because of the simple fact that when they were sending me reports of his -- you know, his development, to me, I felt like they didn't apply to him, because of the age. They started sending me reports about his development when he was like one years old, and a lot of the questions on that paper that they were asking me, I felt didn't apply, because of his age. A lot of the questions, I felt, you would ask a mother taking care of a four-year-old.

AR at 35.

Plaintiff testified that D.Y. weighed 35 pounds and was 38 inches tall during an annual exam in November 2014. AR 39. D.Y. saw Dr. Lopez every six months to a year, and had an appointment scheduled for two weeks after the hearing so that Dr. Lopez could refer him to a

psychologist, as well as a pulmonologist, for his asthma. AR 40. She agreed to give Dr. Lopez an envelope, so that the specialist could send an update to the ALJ. AR 40.

Plaintiff testified that D.Y. attended preschool at Trenton Head Start, which he started in in September of 2014. AR 41. She reported that D.Y.'s disability coordinator at the school wanted him to be evaluated for a speech delay or possible learning disability, but that there had been no determination at the time of the hearing. AR 42. The disability coordinator told her that an evaluation at that time would not be thorough because D.Y. was very young, and that "usually they try to give a full evaluation when they're…five to six years of age." AR 43.

When asked how D.Y. was faring at school, Plaintiff further testified as follows:

> He's getting along great with the kids. As far as like shapes he doesn't talk as much. The teacher said that he doesn't talk as much. He doesn't really understand questions, when you ask him a question or you say well, what is the dog doing outside? He says ah—he just say ah, or he'll say doggie. So he doesn't really like repeat what, you know, the teacher says. So she's like, you know, that kind of raised a little bit of concern, you know, for her. Because he should be on a level of learning—she said there was some level that he's supposed to be on, and he's not on that level yet.

AR 43. She testified that DY has knowledge of general safety issues, "like don't put your hand on the stove," but that he might "dash out in the street if he…was chasing after a ball." AR 43-44.

Regarding D.Y.'s asthma, D.Y.'s mother also testified that the condition did not typically affect his ability to walk and run, but that he had "very severe" asthma in the summertime and that she limited his time outdoors during the summer. AR 44. She also testified that "if it's like really sunny outside, I usually don't let him go, because it like triggers a lot of his allergies," and that "I try not to let him run as much, because he gets very winded and tired." AR 44. She testified that when she takes him to the park, she has "to take his nebulizer with him, just in case, if he has an episode." AR 44. During the summer, she testified that she would have to use the

nebulizer on D.Y. daily, and that she was "trying to get him to a pulmonologist, to see if there might be something else going on, besides his asthma." AR 44. She said that despite the severity of the asthma, D.Y. had only been to the emergency room for it once when he was one, that he had never had any inpatient hospitalizations because of it, and that he took no other medication for it besides the nebulizer. AR 45.[2]

Regarding D.Y.'s social development, Plaintiff also testified that D.Y. "gets along great" with his brothers and sisters. AR 46. She testified that D.Y likes to play on the computer, but that she did not let him because he did not understand it yet, and that he likes watching Sponge Bob, Sesame Street, and Ninja Turtles, but is not capable of sitting through an entire show because he is very active. AR 46-47. When asked about any other general concerns she had about D.Y., Plaintiff testified that she became concerned that he might have a learning disability because of a family history of disabilities and because "he talks, but he doesn't really kind of like—you don't understand what he's saying." AR 48.

### F. ALJ's Decision

On June 8, 2015, the ALJ issued a written decision regarding Plaintiff's continuing eligibility to receive SSI. A.R. 13–27. At the outset, the ALJ noted that, in order to be entitled to SSI as an individual under the age of 18, Plaintiff had to demonstrate that D.Y.'s disability had not ended, pursuant to section 1614(a)(3)(C) of the Social Security Act. AR 20. In determining whether D.Y. continued to be disabled, the ALJ applied the standard three-step sequential evaluation process set forth under 20 CFR 416.994a(b)). AR 20

At step one, determining whether medical improvement has occurred, the ALJ noted that the most recent favorable medical decision finding that D.Y. was disabled—known as the

---

[2] Medical notes indicate that this emergency room visit was not related to D.Y.'s asthma. AR 362.

"comparison point decision" or CPD—was the determination dated July 18, 2011. AR 16. At the

time of the CPD, the claimant had a single "medically determinable impairment," premature

birth, which was found to functionally equal the listings (20 CF'R 416.924(d) and 416.926(a).

AR 16. His premature birth functionally equaled the listing because his birth weight was "at or

more than 2 standard deviations below the mean or…below the 3rd growth percentile for the

gestational age of the infant." AR 17. The ALJ then determined that medical improvement

occurred as of June 17, 2013. AR 17. He noted that there had been an increase in D.Y.'s birth

weight, birth head circumference and birth length, and, at that time, he had no known allergies

and was developing normally. AR 17. He continued that while Plaintiff now alleges disability

due to asthma, she also reported that "overall his health is great." AR 17. Although Plaintiff

claimed that D.Y.'s current weight was 25-28 pounds, a November 2014 treatment note indicated

he weighed 35 pounds and stood 38 inches tall. AR 17. Thus, based on a thorough review of the

evidence, the ALJ concluded that there were no concerns from treating physicians regarding the

claimant's height and weight. AR 17.

At step 2, the ALJ analyzed whether, even though improvement occurred, D.Y.'s

impairment still medically equaled the same listing as it was written when he was first

diagnosed. AR 17. Analyzing the six domains of function, the ALJ determined that D.Y.'s

current condition did not meet the listing for low birth weight:

- Acquiring and using information: The ALJ noted that this domain considers "how well a child is able to acquire or learn information, and how well a child uses the information he has learned (20 CFR 416.926a(g))." AR 18. The decision notes that, since June 17, 2013, D.Y. "had no limitation in acquiring and using information as a result of the impairments present at the CPD." The evidenced revealed "no limitation in acquiring and using information due to his history of low birth weight," nor any indication of "neurological/cognitive delays nor any other symptoms/limitations that would result in limitation in this domain." AR 18. Though Plaintiff alleged the D.Y. "had some difficulty understanding and learning, no treating physicians have expressed any such concerns." AR 18.

- Attending and Completing Tasks: The ALJ noted that this domain considers "how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities (20 CFR 416.926a(h))." AR 19. The decision notes that, since June 17, 2013, D.Y "has had no limitation in attending and completing tasks as a result of the impairments present at the CPD." AR 19. The evidence revealed "no limitation in this domain as a result of his history of low birth weight" nor "any focusing/listening problems." AR 19. The ALJ observed that Plaintiff had "admitted the claimant followed most simple, one-step directions (though she alleged he had difficulty following twostep directions and listening for at least 5 minutes); however, in another report she admitted he had no trouble understanding and learning." AR 19. He concluded that, "[o]nce again, no treating physicians have suggested [D.Y.] had any difficulties in this domain (related to his low birth weight)." AR 19.

- Interacting and Relating with Others: The ALJ noted that this domain considers "how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others (20 CFR4 l 6.926a(i))." AR 19-20. The decision notes that, since June 17, 2013, D.Y. "has had no limitation in interacting and relating with others as a result of the impairments present at the CPD." Although Plaintiff "alleged the claimant did not speak clearly and could not be easily understood by others…treatment records reveal no concerns regarding communicative delays or social functioning limitations." AR 20.

- Moving About and Manipulating Objects: The ALJ noted that this domain considers "how well a child is able to move his body from one place to another and how a child moves and manipulates objects. These are called gross and fine motor skills (20 CFR 416.926a(j))." AR 20. The decision notes that, since June 17, 2013, D.Y. "has had no limitation in moving about and manipulating objects as a result of the impairments present at the CPD." AR 21. Plaintiff "admitted [D.Y.] had no difficulty with physical activities, though she alleged he was unable to stack small blocks or hold a crayon/pencil." AR 21. The ALJ concluded that "[t]hough [D.Y.] may have some difficulty with physical activities secondary to his asthma, this condition was not present at the CPD," and "[h]is low birth weight has not resulted in any significant limitations in this area." AR 21.

- Caring for Yourself: The ALJ noted that this domain considers "how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways. This includes how the child copes with stress and changes in the environment and whether the child takes care of his own health, possessions, and living area (20 CFR 416.926a(k))." AR 21. The decision notes that, since June 17, 2013, D.Y. "has had no limitation in the ability to care for himself as a result of the impairments present at the CPD." AR 22. Plaintiff "alleged the claimant was unable to undress by himself or cooperate in brushing his teeth, but noted

no other limitations in this domain." AR 22. The ALJ concluded that "[i]n light of his broad range of abilities in this area and the lack of any evidence demonstrating a correlation between his low birth weight and these difficulties…[D.Y.] has had no limitation in this area as a result of his low birth weight." AR 22.

- Health and Physical Well-Being: The ALJ noted that this domain considers "the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects (20 CFR 416.929a(l))." AR 22. The decision notes that, since June 17, 2013, D.Y. "has had no limitation in health and physical well-being as a result of the impairments present at the CPD," because his "low birth weight has resolved and no treating physicians have expressed concerns regarding his current height and weight." AR 23. He concluded that there "is no showing of any residual symptoms stemming from his low birth weight and thus the undersigned finds no limitation in this area." AR 23.

In summary, the ALJ concluded that, since June 17, 2013, D.Y.'s impairments present at the CPD "have not resulted in either 'marked' limitation in two domains of functioning or 'extreme' limitation in one domain of functioning," meaning that "these impairments have not functionally equaled the listings since June 17, 2013." AR 23.

At step 3, determining whether the child is currently disabled considering all his present impairments, including any not present or not considered at the CPD, the ALJ concluded that, since June 17, 2013, D.Y. has not had an impairment or combination of impairments that functionally equaled the listings. AR 23. The ALJ undertook the required two-step process to evaluate 1) whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the child's pain or other symptoms; and, 2) whether the intensity, persistence, and limiting effects of the child's symptoms limit the child's ability to do basic work activities. AR 24.

The ALJ found, at the first step, that D.Y.'s asthma constituted a "severe impairment," as defined by 20 CFR 416.924(c)), and that the condition could reasonably be expected to produce the alleged symptoms. However, at the second step, the ALJ determined that these symptoms

15

resulted in few limiting effects, and, thus, his impairment did not functionally equal Listing

103.03 (asthma). AR 24. He noted that "his asthma has not resulted in attacks as described in

103.03(B), wheezing as contemplated in 103.03(C) or growth impairment as noted in

103.03(D)." AR 23. Furthermore, "diagnostic testing has not revealed FEV1 values as

enumerated in 103.03(A)." AR 23. In weighing the evidence, the ALJ assigned only "partial

weight" to Dr. Azaro's and Kaye's opinions that D.Y. did not have any limitations in certain

areas, finding that, giving the D.Y. "the utmost benefit of the doubt, the totality of the evidence

suggests D.Y. has 'less than marked' limitations with in the acquiring and using information,

attending and completing tasks and health and well-being." AR 25.[3] In making this

determination, the ALJ considered the same six domains of function that he had previously

analyzed:

- Acquiring and using information: The ALJ determined that, since June 17, 2013, D.Y.
  "has had less than marked limitation in acquiring and using information." AR 25. The
  decision noted that although Plaintiff alleged that D.Y. "had some trouble in this area…
  and that teachers raised concerns regarding a potential learning delay…, the objective
  medical evidence does not corroborate these allegations, as they consistently note normal
  growth/development with no need for intervention regarding his cognitive function." AR
  24-26. Still, giving Plaintiff the "utmost benefit of the doubt" the ALJ found that D.Y had
  limitations that qualified as "less than marked" in this area. AR 26.

- Attending and Completing Tasks: The ALJ determined that, since June 17, 2013, DY
  "had less than marked limitation in attending and completing tasks." The decision noted
  that Plaintiff alleged that D.Y. "had some trouble in this area with difficulty sitting still
  and focusing…., [but] the objective medical evidence does not corroborate these
  allegations, as they note normal growth/development with no need for intervention." AR
  26. Giving Plaintiff the "utmost benefit of the doubt," the ALJ found that D.Y had
  limitations that qualified as "less than marked" in this area. AR 26.

- Interacting and Relating with Others: The ALJ determined that, since June 17, 2013, D.Y.
  "has had no limitation in interacting and relating with others." AR 26. He noted that
  Plaintiff "admitted the claimant got along well with his siblings and other students,
  though he reportedly did not interact very much with teachers; she also alleged his speech

---

[3] The ALJ applied "great weight" to the remainder of Dr. Azaro and Dr. Kaye's opinions. AR 25.

was often unintelligible." AR 26. Nonetheless, "treatment notes do not mention any behavioral or communicative concerns." AR 26.

- Moving about and Manipulating Objects: The ALJ determined that, since June 17, 2013, D.Y. "has had no limitation in in moving about and manipulating objects." AR 26. The decision noted that "[t]hough the claimant has asthma, this condition appears well controlled with albuterol. Treatment notes…reveal the claimant moved about well and ran." AR 26. It further noted that although Plaintiff "alleged the claimant had difficulty stacking small objects and holding pencils/crayons, she otherwise admitted the claimant had no physical limitations." AR 26.

- Caring for Yourself: The ALJ determined that, since June 17, 2013, D.Y. "has had no limitation in the ability to care for himself." AR 26. The decision noted that Plaintiff alleged that D.Y. "required assistance with bathing and brushing his teeth… [but] trouble with these tasks does not necessarily require a finding that the claimant has limitation in caring for himself." AR 26. The records further "reveal[ed] no issues with sleep/appetite or with controlling his emotions, nor with developmental milestones." AR 26.

- Health and Physical Well-Being: The ALJ determined that, since June 17, 2013, D.Y. "has had less than marked limitation in health and physical well-being." AR 26. The decision noted D.Y.'s asthma "which is treated with albuterol," but "has been characterized as mild in severity." AR 26. It further noted that Plaintiff did state that D.Y.'s asthma was "very bad," but that she also admitted that "overall his health is great." AR 27. The decision also relied on "Well-child visits," which "similarly indicate that the claimant's only ongoing medical condition is asthma and the record reveals no recent hospitalizations for this impairment." AR 27. Nonetheless, because the asthma "require[s] medication, and considering [Plaintiff's] allegation that his symptoms are worse in the summer and fall," the ALJ found that found that D.Y had limitations that qualified as "less than marked" in this area. AR 27.

Therefore, the ALJ determined that, beginning on June 17, 2013, D.Y. had limitations qualifying as "less then marked" in three areas, and no limitations in three areas. AR 27. This fell below the threshold for finding disability, which would have required findings of either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning. AR 27. These findings resulted in the ALJ determining that D.Y.'s disability ended as of June 17, 2013, and that had not become disabled again since that date. AR 27.

### G. Post-Decision Evidence

On August 3, 2015, Plaintiff filed a request for reconsideration of the of the ALJ's decision with the Appeals Council. AR 263. As part of this request, Plaintiff submitted additional

evidence that was not part of the record that the ALJ reviewed. She explained that this evidence was not made available to the judge because "there is a process that must be met in order for this evidence to exist," but she gave the ALJ the business card of Ashley Gonzalez, the disability coordinator at the school that DY attended, and urged him to call her if he had any questions. AR 294.

First, she submitted two "Early Screening Inventory" ("ESI") reports from D.Y.'s school, conducted by a teacher, Erika L. Punko. The first was on October 17, 2014, when D.Y. was 3 years old, and indicated that he had developmental issues in copying forms in drawing, visual sequential memory, and verbal reasoning. AR 266. The report noted that his speech was sometimes not intelligible inside and outside of context. AR 266. In total, D.Y. received a score of 12, meaning that he needed to be rescreened (a score of 14 would have qualified as "OK"). AR 272. On January 13, 2015 D.Y. was screened again by Ms. Punko and received a score of 13. The teacher noted his speech needed to be evaluated "ASAP." AR 278.

Second, Plaintiff submitted internal "disability concern notes" from Ms. Gonzalez. The notes indicate that, on July 7, 2015, Plaintiff had stopped in the office asking for "evaluations" that had been done on D.Y. AR 281. Ms. Gonzalez explained that "no clinical evaluation was done for [D.Y.] but the teachers administer an educational survey/tool that she can try to request a copy of." AR 281. The notes further state that staff at the school reminded Plaintiff "that although this exam may help her for her appeal its [sic] not a clinical evaluation…and may not be enough [to] prove a potential delay." AR 281. The notes include further observations from school staff about D.Y., including that he demonstrated "huge improvement" in reading comprehension, though his teacher, Ms. Punko noted that "there hasn't been any real

improvement with [D.Y.'s] speech." AR 283, 285. The notes also recount a conversation with

D.Y., in which he was asked to answer questions and identify shapes. AR 286.

Third, Plaintiff submitted documentation from a July 11, 2015 appointment with Dr.

Lopez.[4] The documents indicate that Dr. Lopez referred D.Y. to a neurodevelopmentalist to

evaluate him for speech delay and expressive language disorder. AR 289. Further, at the same

appointment, in addition to the albuterol he had already been prescribed, Dr. Lopez prescribed

another inhaler medication for D.Y.'s asthma, Ventolin HFA 90 mcg/actuation. AR 292.

## II.  **STANDARD OF REVIEW**

On a review of a final decision of the Commissioner of the Social Security

Administration, a district court "shall have power to enter, upon the pleadings and transcript of

the record, a judgment affirming, modifying, or reversing the decision of the Commissioner

of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see*

*Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding

questions of fact are deemed conclusive on a reviewing court if supported by "substantial

evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

While the court must examine the record in its entirety for purposes of determining whether the

Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d

772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503

(3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less

than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It

means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*,

---

[4] This is seemingly the appointment that Plaintiff referenced at the hearing. *See* AR 40 (Plaintiff testifying that D.Y. had an appointment scheduled for two weeks after the hearing so that Dr. Lopez could refer him to a psychologist, as well as a pulmonologist, for his asthma).

186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

The Act requires that the Commissioner conduct a periodic review of a child's continued eligibility for SSI. 20 C.F.R. § 416.994a. There is no presumption of continuing disability. *Powell v. Astrue*, No. 08-0840, 2010 WL 3245414, at *2 (D. Md. Aug. 17, 2010) (citing *Cutlip v. Sec. of Health and Human Servs.*, 25 F.3d 284, 286–287 n. 1 (6th Cir. 1994)). The periodic review is governed by the three-step medical improvement review standard (MIRS). *See* 20 C.F.R. § 416.994a(a); SSR 05-03p; *Blaine v. Astrue*, No. 09-104, 2010 WL 3291825, at *2 (E.D. Va. Aug. 18, 2010).

At step one, the ALJ will consider whether medical improvement has occurred in the impairments that were severe as of the time of the most recent favorable decision, known as the comparison point decision ("CPD"). 20 C.F.R. § 416.994a(b)(1). Any decrease in medical severity of the impairments in existence at the time of the CPD constitutes medical improvement, and the ALJ will disregard only minor changes in the signs, symptoms and laboratory findings that "obviously do not represent medical improvement." 20 C.F.R. § 416.994a(c). At step two, the ALJ must determine whether the child's impairment(s) at the time of the CPD now meets or medically equals the same Listing that it met or medically equaled at the time of the CPD. 20 C.F.R. § 416.994a(b)(2); SSR 05-03p.2 At step three, the ALJ must determine whether the child is currently disabled under the rules in 20 C.F.R. § 416.924(c) and (d), considering all the impairments that the child had at the time of the ALJ review, including any not present or not

considered at the time of the CPD. 20 C.F.R. § 416.994a(b)(1)-(3). The ALJ must determine

whether the child has a medically determinable "severe" impairment or combination of

impairments; and whether the child's impairment or combination of impairments meets,

medically equals, or functionally equals the severity of any impairment in the Listings. 20 C.F.R.

§§ 416.924(c), (d), .994a(b)(3)(i)-(iii).

In determining whether an impairment or combination of impairments functionally equals

the Listings, the ALJ must assess the claimant's functioning in terms of six domains: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

with others; (4) moving about and manipulating objects; (5) caring for yourself; and health and

physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). At step three, a child functionally equals

a Listing when he has a severe impairment that results in "marked" limitations in two domains of

functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926(a).

## III.    <u>DISCUSSION</u>

Plaintiff appears to be making two central challenges to the ALJ's decision. First, she

contends that the appeals council improperly disregarded the evidence that Plaintiff submitted in

her appeal of the ALJ's decision. Second, although Plaintiff does not take issue with the ALJ's

analysis in the first two steps of the three-step analysis mandated by 20 C.F.R. § 416.994a(a), she

challenges various aspects of the ALJ's analysis at step three of the analysis, where he

determined that D.Y. is not currently disabled. For the following reasons, both of Plaintiff's

arguments fail.

### A.  Post-Hearing Evidence

When a claimant seeks to rely on evidence that was not before the ALJ, a district court

has the option to remand the case to the Commissioner for consideration of that evidence, but

only if the evidence is "new" and "material," and only if the claimant shows good cause why it

was not presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). The burden

is on the party attempting to introduce the evidence to make this showing. *Id.* at 595. "[R]emand

is appropriate when the district court learns of evidence not in existence or available to the

claimant at the time of the administrative proceeding that might have changed the outcome of

that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). "The fact that a claimant is

unrepresented by counsel and has knowingly waived this right is not alone sufficient for

remand." *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); *Pennington v. Comm'r of

Soc. Sec.*, 683 F. App'x 168, 170 (3d Cir. 2017) (finding that *pro se* status of plaintiff, who was

able to submit numerous records to the ALJ and present her case at the hearing, did not constitute

good cause).

Here, Plaintiff contends that the following three pieces of "new" evidence should be

considered in reviewing the ALJ's decision: 1) two "Early Screening Inventory" ("ESI")

screenings from D.Y.'s school, conducted by a teacher, Erika L. Punko that indicated that D.Y.'s

language abilities were below average, 2) notes from the disability coordinator at D.Y.'s school

discussing his condition, and 3) two pieces of medical evidence: a referral note from D.Y.'s

primary care physician for him to be evaluated by a neurodevelopmentalist, and a form

indicating that D.Y. received a prescription for a new type of asthma medication.

As an initial matter, the ESI screenings and many of the notes from the school disability

coordinator that Plaintiff has submitted were prepared well before the hearing before the ALJ.

Plaintiff has provided no reason why she did not submit the evidence, besides claiming that

"there is a process that must be met in order for this evidence to exist." This is not sufficient to

show good cause, even given Plaintiff's *pro se* status. *Pennington*, 683 F. App'x at 170.

Further, even if I were to consider the additional evidence that Plaintiff seeks to include, it would not have changed the result. Whether or not a diagnosis meets an enumerated listing depends on "medical findings consisting of signs, symptoms, and laboratory findings which meet the required severity of the impairment in the listing." 20 C.F.R. § 416.925. Here, Plaintiff has first introduced screening results and staff notes from teachers at D.Y.'s school; these school records, which the disability coordinator admitted, do not constitute "clinical evaluation[s]… and may not be enough [to] prove a potential [speech] delay." AR 281. Further, the medical evidence that Plaintiff seeks to have considered fails to further support the evidence already in the record. Indeed, Plaintiff has included a referral from a primary care physician to a specialist to evaluate D.Y. for speech delay, but has not included any reports from the specialist that might clarify the severity of the condition. Moreover, although Dr. Lopez's report reveals that she prescribed D.Y a new medication for his asthma, it does not indicate the reason for this new prescription, or whether D.Y.'s symptoms had, in fact, deteriorated.[5]

Given that the ALJ was aware of D.Y.'s asthma and speech issues—and discussed them at length in his decision—such scant additional evidence would not have altered the result.

**B. The ALJ's Determination, at Step Three of the Medical Improvement Review, that D.Y. Was Not Disabled Based on His Current Impairments**

Plaintiff challenges the ALJ's determination, at step three, that D.Y. was not disabled based on his current impairments. In making this determination, an ALJ must decide whether a child's current condition meets or medically equals one of the listed impairments according to

---

[5] In addition to the evidence that Plaintiff submitted to the Appeals Council that is part of the record before the Court, Plaintiff now attempts to submit additional evidence, including an autism examination that concluded that D.Y. did **not** meet the criteria for Autism Spectrum Disorder. *See* ECF No. 1, Exs. B, C. Even though the court is not bound to consider evidence that is not part of the record, I have reviewed the evidence and determined it would also not have altered the ALJ's decision.

the Social Security regulations. 20 C.F.R. §§ 416.925, 416.926. A child meets a Listing if the specific findings detailed within the description of the listing exist with respect to that child's diagnosis. 20 C.F.R. § 416.925(d). In order to meet a Listing, a claimant must show that all of the specific criteria are met. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). "An impairment that manifests only some, but not all, of the criteria for a listing, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530. Whether a Listing is met depends not only on the diagnosis, but also on medical findings consisting of signs, symptoms, and laboratory findings which meet the required severity of the impairment in the Listing. 20 C.F.R. § 416.925.

Plaintiff alleges that the ALJ failed, at step three of the analysis 1) "to grant controlling weight to the medical opinions of Claimant's treating physician…and in doing so, failed [to] recognize asthma as a debilitating disease"; 2) failed "to properly analyze the combination of Claimant's impairments, specifically the impact of his severe asthma, at Step Three as well as other impairments including but not limited to Intellectual Disability, Expressive Language Disorder, Receptive Language Disorder, Lack of Motor Coordination, Executive Functioning Difficulties"[6]; and 3) "improperly evaluat[ed] and weigh[ed] the [c]redibility of Plaintiff's testimonial statements" about D.Y.'s symptoms and his "[r]estricted activities of daily life." ECF No. 20 at 3. However, a review of the ALJ's decision reveals that the ALJ, in fact, correctly applied the law and considered and weighed all of the evidence that Plaintiff contends was overlooked. The decision was, therefore, supported by substantial evidence.

---

[6] Although Plaintiff was evaluated for intellectual and language-related disabilities, the record does not support Plaintiff's claim that D.Y. had "impairments" in these areas.

The ALJ initially found that, from June 17, 2013, up to the date of the ALJ's decision on June 8, 2015, D.Y. had the severe impairment of asthma. AR 23. The ALJ analyzed whether D.Y.'s condition met the Listing for asthma (Listing 103.03), and appropriately found that D.Y.'s condition did not meet the Listing. The Listing for asthma that was in effect at the time of the ALJ's decision provided the following criteria to determine whether a condition qualifies for benefits:

A. FEV1 equal to or less than the value specified in Table I of 103.02A; OR

B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks; OR

C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or

2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period; OR

D. Growth impairment as described under the criteria in 100.00.

Pt. 404, Subpt. P., App. 1, Listing 103.03 (2015).[7] Here, the ALJ explained that the record contained no diagnostic tests or FEV1 values as required by 103.03A; did not result in asthma attacks as described in 103.03(B); did not cause wheezing between attacks with additional imaging and use of corticosteroids as described in 103.03(C); and did not result in a growth impairment as explained in 103.03(D). AR 23. The Court has found nothing in the record that contradicts these findings.

---

[7] This Listing, which has since been updated, was the applicable Listing at the time of the hearing officer's decision.

Indeed, the ALJ based these determinations on a careful review of the medical record. The ALJ noted that 2013 doctor's visits, albeit prior to June 17, 2013, "revealed no concerns regarding the D.Y.'s general health," and a February 2013 checkup note indicated the D.Y. had normal growth and development, ran well, walked up steps and had normal muscle tone. AR 24. The ALJ also reviewed November 2013 and November 2014 treatment records indicating that D.Y.'s sole medical condition was asthma, which continued to be treated with albuterol, but did not significantly limit D.Y.'s physical activities. AR 24. The records that the ALJ reviewed also indicated no concerns regarding behavioral issues or mental health. AR 24. Another November 2013 treatment note that the ALJ relied on characterized D.Y.'s asthma as "mild persistent" and indicated he had a normal sleep pattern, normal appetite, and normal growth and development. AR 24.

Because the ALJ found that D.Y.'s asthma did not, in fact, meet or equal Listing 103.03, the ALJ next considered whether the asthma "functionally equaled" a Listing, i.e., had marked limitations in two domains of functioning, or extreme limitations in one domain. 20 C.F.R. § 416.926a(a); *see also Gerette v. Colvin,* No. 15-00012, 2016 WL 1254611, at *2 (W.D. Va. Feb. 2, 2016), *report and recommendation adopted*, No. 15-00012, 2016 WL 1296082 (W.D. Va. Mar. 30, 2016). To do this, the ALJ appropriately applied the six domains of functioning.

The ALJ found that D.Y. did have limitations in three of the six domains (acquiring and using information, attending and completing tasks, and health and physical well-being), but categorized these limitations as "less than marked," which is insufficient to find functional equivalence to a listing. Again, the ALJ based these determinations on a careful review of the record.

Regarding acquiring and using information, the ALJ recognized that D.Y. "had some trouble in that area" and that teachers had raised concerns about a potential learning delay, but he found that these issues were not severe, as the objective medical evidence consistently indicated that D.Y. had "normal development and growth." AR 25. Indeed, setting aside the reports from the agency medical experts, Dr. Azaro and Dr. Kaye, to which the ALJ did not afford significant weight, D.Y.'s pediatrician, Dr. Lopez, also reported no issues in this area. AR 25. Moreover, the ALJ noted that Plaintiff admitted that D.Y. played "pretend," followed simple one-step directions, knew and could point to body parts, could speak simple words and use two-word phrases, and used short sentences. AR 24-25. Further, the ALJ also referenced the early 2015 school conference report, which indicated that D.Y. was able to count to 8, identified a circle and triangle, drew a picture, was beginning to sustain balance, spoke short sentences, and had strength in practicing activities until successful. AR 25. Therefore, although the ALJ found that D.Y. had some difficulties in acquiring and using information, his conclusion that these difficulties were not severe was based on substantial evidence.

The ALJ also found "less than marked" limitation in "attending and completing tasks." The ALJ noted that Plaintiff had suggested that D.Y. had problems focusing and sitting still. AR 26. Nonetheless, the medical reports did not indicate an issue in this area, and Plaintiff admitted that D.Y., *inter alia*, played simple games with other children, cooperated in getting dressed and brushing his teeth, drank from a cup or glass without help, and fed himself with a spoon. AR 25. Therefore, the ALJ reasonably concluded that D.Y.'s impairment, in this context, was not "marked."

As to health and physical well-being, the ALJ again concluded that the medical evidence in the record, along with Plaintiff's own admissions, supported a finding that D.Y.'s asthma was

not sufficiently severe to qualify as a "marked limitation." As already noted, the ALJ recounted the medical evidence regarding Plaintiff's asthma, and remarked that it is treated with albuterol but was mild in severity. Indeed, Plaintiff even admitted that "overall [D.Y.'s] health is great." AR 25. Nevertheless, given that the condition required medication, and considering that Plaintiff had characterized D.Y.'s symptoms as "very bad" during the summer and fall, including limitations on his ability to play outdoors, the ALJ appropriately found that D.Y. had a "less than marked" limitation in this area. AR 25.

The ALJ also appropriately found, based on the record evidence, that D.Y. had no limitations with respect to the three other domains of functioning: interacting and relating with others, moving about and manipulating objects, and caring for yourself.

Regarding interacting and relating with others, the ALJ noted that the evidence did indicate that D.Y. did not interact very much with teachers, and that others at times had difficulty understanding his speech. AR 26. However, as the ALJ concluded, Plaintiff testified at the hearing that D.Y. got along well with his siblings and other students, and treatment notes do not mention any behavioral concerns that would rise to the level of an impairment in this area. AR 26.

The ALJ also found that D.Y. had no limitation in moving about and manipulating objects. This is corroborated by the record. As the ALJ noted, while D.Y. may have had had difficulty stacking small objects and holding pencils and crayons, Plaintiff also otherwise admitted the he had no significant physical limitations. AR 26. And, although D.Y. had asthma, there is no indication that it severely impacted his ability to move about, as treatment notes revealed that D.Y. ambulated well and ran. AR 26.

Nor did the ALJ find any limitation in D.Y.'s ability to care for himself. This was also based on substantial evidence. That D.Y. required assistance with bathing and brushing his teeth, as the ALJ noted, "does not necessarily require a finding that the claimant has limitation in caring for himself." AR 26. Further, as the ALJ observed, medical records revealed no issues with D.Y.'s sleep or appetite or with controlling his emotions, nor with any developmental milestones. AR 26. Indeed, the Court agrees that there is no indication in the record that D.Y.'s ability to care for himself was abnormal for a child of his age.

Based on this careful review, it is clear that Plaintiff's argument that the decision "was not supported by the record" is without merit. At step three of the analysis, just as he had done at steps one and two, the ALJ carefully considered the medical evidence and came to a conclusion that was factually supported. The decision evinces no sign that the ALJ was, as Plaintiff contends, "play[ing] doctor"" or "making [his] own independent medical assessments." *See* ECF No. 20 at 5 (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). The ALJ properly evaluated D.Y.'s asthma independently, and in combination with his other symptoms, and, contrary to Plaintiff's suggestion, "evaluat[ed] and weigh[ed] the credibility of the Plaintiffs testimonial statement," including how D.Y.' symptoms impacted his "activities of daily life." *Id.* at 3.

Accordingly, because the ALJ's decision that D.Y.'s current impairments do not qualify him for SSI is supported by substantial evidence, I affirm.

IV. **CONCLUSION**

For the reasons set forth above, I find that the ALJ's decision is supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed.

Dated:  October 29, 2018

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
United States District Judge